The case this morning is number 145034, Unitrac, LLC v. United States. Mr. Hayes. Good morning. Your Honor, I can be actually fairly brief on this. The tolling statute begins upon, as I read this, receipt of a written claim for compensation. The August 25th letter by Unitrac to the government is indeed a written claim for compensation. No question. Well, how could that be when you said you didn't want them to treat it as a claim? Excuse me? How could that be when you said you didn't want them to process it as a claim? It is a claim for compensation. What they said was they didn't want to process it as formal defars action, which, in our view, has nothing to do with the, quote, tolling statute. The tolling statute is relative to suit. That's one of the issues. And the receipt of a written claim for compensation, even the court itself specifically found, the lower court, that the letter was indeed compliant with the statute. That's the issue. The court found that the letter was compliant and then went about and rewrote the statute to require the filing of a formal defars action. There's no authority to just change a statute that talks about a written claim for compensation. Well, how is it a claim when you're saying we don't want it to be treated as a claim? Excuse me? How is it a claim when you say you don't want it treated as a claim? It's a claim because it complies as the district court found. It complies, it identifies the patent. It accuses the device to, it accuses the government of infringement. It identifies the accused product. It indicates that when we talk about a claim for compensation, it indicates a need for a license. And if it's not a claim, as you just asked it, the district court found that it was. The lower court said it did comply with the statute. But what the lower court said is, so what? I don't care if it complies with the statute. What I'm going to do is I'm going to rewrite the statute, which it did, and I'm going to require that now, in order to begin this tolling statute, you have to file a formal defars action. And I've looked up, and I'm sure you're more familiar with myself, of all the hoops that one has to jump through to file a formal defars action with about 72 different paragraphs. And this court, and the lower court, had no authority to read that requirement into the statute, particularly given the case from the Federal Circuit here of this Infotech case, which says that the language is plain and unambiguous. You don't go, in fact, to the regulations or guidance at all. And the district court or the lower court in this particular instance, they didn't identify any, quote, ambiguity at all in the statute to rely upon to even do what they did. Similarly, the government, they haven't identified in their briefs any legitimate ambiguity. They start saying that the word claim is somehow universally ambiguous. I don't think a claim for compensation to lawyers is ambiguous whatsoever. And this court itself, the court of claims anyways, has found that two lines basically saying you infringe is sufficient to comply with that statute. And in the Dow case that we cited to you, that says that the whole idea of the statute is to give the government a chance to evaluate the claim and to settle. And they spent two years approximately trying to settle this thing with detailed claim charts and all the rest. There is no, the bottom line is, there's no authority that I can see and that anybody has cited, the lower court or whatever, that allows the court to simply read into that, that's the only statute, read into 35 U.S.C. 286, a statement that says, in receipt of a written claim for defar's action. There's no authority the other way either. Excuse me? There is no authority the other way either. Well, I would respectfully disagree. What case has ever decided this question of whether filing a claim and asking that it not be processed means that you filed a claim? Oh, you're correct. There is none. You're right. The authority that we say supports opposition about not rewriting the statute to that effect is the fact of the Infotech case, which on its face indicates that the statute has to be ambiguous. If it's plain and ambiguous, that's it. So, I mean, opposition is the statute is plain, it's unambiguous, no one has pointed out a legitimate ambiguity that would allow the court to dip in and now rewrite it. And I think the fact that we said, well, don't consider this a defar's action, is irrelevant. It's totally irrelevant, simply because it's irrelevant. You didn't just say it was a defar's action, you also said that you've attempted to settle this on a negotiated basis. That's right. They tried to settle, after the original letter of August, there were many meetings with the government. In the correspondence that was said. Sure. That whole period of time was used specifically, by the way, for the whole purpose of the tolling statute. As in Dow says, what's the purpose of tolling? The purpose of the tolling statute is to allow the government to sit down and try and settle the thing. The purpose isn't for the government to sit down, try to settle it, run the clock out, and then say, ah, you didn't file a formal defar's action, you withdrew it. Well, it's within your control. You can tell them this is a claim, the clock is running. Well, somewhat in your control. I mean, there's a lot more behind the scenes when you're trying to negotiate with the government. There's a lot of politics, there's a lot of everything involved in that circumstance. In the case of Martinez v. United States, we said that a claim accrues when all the events have occurred to fix the government's alleged liability. But if you submit a letter and you say, this is a claim, but don't process it, how does that fix the government's liability? I think what you're doing is confusing, with all due respect, the beginnings of the accrual date, which is another issue. Obviously, that statement, when all events occur to fix liability, that Kinsey case, that issue, the government's liability is fixed when they infringe. That's when they're fixed. They're fixed, which is the accrual argument, but in any event, if you move on to that, when the IUID system was used by the government, that is the time it fixes their, quote, liability. Obviously, they have to sell something that has each and every element of the claimed invention. If they don't, and they only sell a portion thereof, then that's it. But that's when the thing starts running. That's not tolling, that's running. And on that issue, if we move to that just real quickly, on that issue, the biggest error of the district court is the confusion of the court. I understand. The lower court is, in fact, that the registry is not the accused product. The registry doesn't infringe on its own. Did you put in any evidence to that effect? Huh? Did you put in any evidence? Yes, we cited right in the brief. The evidence is that that specific argument was made on... Did you put in any expert testimony on that point? No. Did we? No. The fact is, the evidence that we put in to support that point was A, the interrogatory answers of the government, which specifically put a May 2004 date. Signed under oath, you have those at A3723. That's one piece of evidence. Another piece of evidence, a 30B6 testimony of Mr. Winnington, the government's 30B6 person, as to when was this thing up and running, the whole thing. And that was May 2004. That's not the same thing as the question of whether they satisfied the claim limitation with the system earlier. Excuse me? It doesn't have to be up and running to start the running of the statute of limitations as long as there's a prototype, right? As long as there's a prototype having each and every element of the claim. Right. So that statement is not directed to whether the prototype met each and every element of the claim, is it? Sure it is. Because the prototype did not have, it's conceded that the prototype was not connected to the wide area network. Period. There's no dispute that that prototype was not connected to a wide area network. It was a prototype of a registry, which is a database. The invention is not a database. They would love you to believe it, but it isn't. The invention is a database, and then if you look at the claim, it has a means for communicating by a plurality of users to the database. Yeah, but what about the affidavits? There are two affidavits by Northrop individuals who go through what was happening with the prototype and describe it and say it was accessible to the contractors. You know, there it is. You didn't refute that. How do you deal with that? They didn't refute it. The testimony of, that is incorrect, didn't refute it. The testimony, first of all, the government's answers contradict that. Second, they said it wasn't available. The only way the contractors get, in fact, in communication with the database is over the wide area network. Period. Weren't there other systems that could have been utilized? No. That's the point. The whole point is that the registry was made by the government, and excuse me, by Northrop government. They were going to then hook and integrate that into the wide area network, put it together, and then turn it on. And there absolutely cannot be a dispute that, in fact, that did not occur until 2004. Yeah, but the question is whether that had to occur to satisfy the claim. Well, of course it does, because if you look at element 1H of the claim, it calls specifically for a means for communicating between the users, so to speak, let's call them users, means for communicating electronically between the users and then the database. Yeah, but don't the Ellman and Mills affidavits spell out how there was a means for communication in the prototype? No, it has to be. It's an electronic network. It's the means that's disclosed. If you went and you said, okay, what does that mean? So we have a claim construction, and I would have to point to what that means is. And the means actually has been briefed. It's the modem. All right, and the modem is attached to the network. That's the means. And the question is, when did they have the network with the modem such that a user can type it in? And the answer is, according to the government, not me, according to the government, it was in May. According to their 30B6 person, it was in May. It doesn't matter if you have a prototype. What does the 30B6 witness say that's relevant here? It's at A3385. He testified. He conceded that the WAF, which is the network with the means, which is the means to communicate to the... In your view, that's the only way you can satisfy limitation H, right? Absolutely. So the question is, that's the central question, is whether the WAF is the only way you can satisfy H, or whether the affidavits spell out another way that was used in the prototype to communicate that satisfied the claim. Wait, wait, wait. That satisfied the claim limitation, right? Yes, yes, yes. But the point is, what they're spelling out, and I think we basically did it, is that let's assume you have a prototype, and let's assume you sort of manually stuff it in the data. That's not going to do it. This is an electronic system. This is a system that's designed so that it can sit here in Washington or wherever it may be, and someone in Iraq can figure out what tank it is. If the system is designed to process data from a data bank, and you want to test the system, why isn't entering the information manually effectively test that system? Because the claimed invention… Or enable the system. It isn't, because the claimed invention, excuse me, the claimed invention concerns the electronic communication of the data, not stuffing it in manually with a computer like this when you're sitting right next to it. That's not the idea. The system is a plurality of users out there. You've got a network, and then the communication goes over it. Well, if you're testing the system to see if the system is going to process the data correctly in a way that's expressed in the claims, why wouldn't entering the data manually provide that type of a test? In fact, didn't you admit that that would satisfy, that there's other means by which, other than the WAF, by which means that the system would operate? You have to test the claimed invention. That's what we're talking about. You have to test the system that's the subject of the claimed invention that would infringe. For example… And your argument is the only way you could do that is with the WAF, and we're asking you whether there isn't some other way of testing it that satisfies Limitation H, as the government has argued. Correct. Well, first of all, it wouldn't infringe. Testing it manually, effectively, is what the government is saying, into the prototype area, wouldn't infringe because the first thing we could do is we'd have a claim construction hearing. They would say, boom, the means for doing that is a modem, it's the network, it's all disclosed in the patent, where is that? We didn't have that. That's not an infringement. That test is an infringement. That would be the first argument they would make. Okay. I think we're out of time. You're into your rebuttal or you're past your rebuttal. We'll give you two minutes for rebuttal. Okay. Thank you, Judge. Mr. Ruddy? Good morning, Your Honors. May it please the Court. Unitrack has pointed to no clear error in the Court's decision that this action was barred by the statute of limitations. There's a second issue also that was briefed concerning the means-plus-function language elements in this case, and rather than claiming a specific and innovative way of implementing a function, Unitrack— Why don't you address— First, the last point that they were arguing, that the prototype didn't satisfy the claim limitation. Sure. Well, two points. First, Unitrack below, and I don't think I quite understood their argument until now, was arguing not this element 1H. They were arguing this element 1B, this means for transmitting. They were arguing that this distinction that they've made between this registry and system— Okay, but address 1H. That's what they're relying on now. The Mills Declaration that Northrop has presented has explained that there was a GDS beta box. Now that was a mechanism that was, through the Internet, that was available to contractors and government people alike that had all the core functionality. So as far as means for enabling users to access that data, contractors had access to that. That Internet connection made that available. So whether or not it's a means for transmitting, like they argued below, or it's a means for enabling access, Mills clearly explained this in his declaration, and he was deposed for seven hours along with another witness on this, that the GDS beta box that was available in August of 2003 performed all those core functions. And Unitrack never challenged that below. And that's my point. I was surprised by this 1H. They're arguing now that your interrogatory answer raises a fact issue. What's the answer to that? Well, the answer is very clear. In every interrogatory, we made clear, the government made clear, that these may have been done earlier by our contractor. And it's not surprising that the contractor may have more detailed information than the government did in its own instance. And that's why, if you see, every interrogatory is clear on that point. And that's why the Mills Declaration is very detailed about how him and his other colleagues went about creating this prototype that had all this core functionality. Whether it's the means for transmitting, like they argued below, or the means for enabling users, that GDS beta box had all those core functions. And an example I would think of is, if you have a claim for a tank, and the tank includes a projectile firing mechanism, if I later add a second gun barrel to that tank, it doesn't create a separate accrual. It's still just one tank. And that's why we made a distinction in our brief between cases like Starobin, where there were a number of units, and then cases like Bissell, which was an unpublished decision, but it was consistent with this case, in that there was one unit, and that was alleged to have infringed more than six years prior to the claim. And that's the point. It's not an esoteric issue of infringement. It really has to be based on the allegations of the patentee. And if you look, we point this out in our brief, there is a document that they presented before they ever said that they filed their claim that talks about a number of alternative direct submission methods beyond those including the WAWF. And that's in the record at 2673 to 2679. They explain, beyond the WAWF, you can do it all these other ways, and that's why I think the tank example is pertinent. But not to the issue of tolling. Mr. Hayes explained that there's no case law on someone coming into the government and saying, we want to have this negotiation issue. We want to negotiate first, and then we want to withhold the timing of our administrative claim. The Motorola case, this is cited on page 23 of our brief, it was a quarter federal claims case from 87, but the whole point there was, the quote is, because Motorola itself did not treat the February 25th letter as an administrative claim, it was not seen to trigger tolling. And that's exactly what happened here. Consistent with the Motorola case, if a contractor is – Mr. Hayes is not binding on us. I understand. But here's another argument why this in practice would cause wreak havoc. There's a whole bunch of agency counsel at each of these agencies, particularly the Navy and the Army, come to mind. How would they have an ability to review and deny a claim if one is never officially submitted? And so that's the point. When the language of the statute says the tolling period is two dates, the date of receipt, this is 286, the date of receipt of a written claim for compensation by the department or agency of the government having authority to settle such claim, and the date of mailing by the government of a notice to the claimant that his claim has been denied. So all these agency counsel, whose job it is to address these administrative claims, they wouldn't have an ability to deny it if the claimant or the patentee comes in and just wants to have a negotiation issue. And so you have very clear statements from Mr. Karolakis back from 2007 all the way through 2009. And the Court has obviously read this part, but I'll read it again. This is in the record at 2949. To date, Unitrack has endeavored to settle its infringement claims on a negotiated basis with DOD. Unitrack has filed the necessary documentation and complied in all the respects. And then skipping to the next sentence, however, Unitrack has requested and the department has agreed not to process Unitrack's claims under those procedures at this time because of the unique circumstances presented. We do not believe those procedures are suitable for resolving this particular dispute. That's my point. None of the people in the Navy or DOD general counsel, J. Charles Johnson's office, had an ability to sit down and decide whether or not to deny this. So they had no ability to end the tolling period effectively. These negotiations were just essentially ongoing. And if I could just briefly bring up a point about the means plus function language. The prosecution history is clear that these means for mathematically linking and means for linking were never in the claims originally. And if you look at the prosecution history, you'll see that when they were in reissue, they told the Patent Office that the corresponding structure was, it is clear that a computer, a database, a centralized database are all suitable structures. That's antithetical to this court's aristocrat tech case. But then, when we get into litigation, now they're saying something completely different. This is now their concatenation argument, and this is on page 44 of their brief. And they now say that this algorithm is not a computer, it's not a database, it is somehow concatenation. And I think that that brings up, is consistent with this court's holding in Ibermeth, where the court looks to, there was an algorithm, clearly an algorithm in figure 10 in that patent. And the court said, because you have said that the algorithm is not what's in this figure, it's something else, that's going to be a binding admission on you. And when that's a binding admission on you, your patent's indefinite for that purpose, because of public notice. I see that I'm in my rebuttal time. Thank you, Mr. Wright. See, actually, you affirmed that there's no trial for it. Thank you very much. Mr. Hoblon. Good morning, Your Honors. And on this snowy morning, may it please the Court. I'd like to start with the accrual issue that Unitchak had raised, and point particularly to the language in the record about this WAWF, which, by the way, WAWF stands for the Wide Area Workflow, not Wide Area Network. That's important because the GDS beta box was the mechanism by which the registry was connected to the network. So the issue is that this concept of IUID was established in the 2002 timeframe by the government. And then onwards into 2003, they came up with certain requirements that they wanted it to have. And by June of 2003, they asked Northrop Grumman to develop something, to develop a prototype. And the issue is that by August 22nd, 2003, that prototype was developed and was made available by and for use by the government. And the Wide Area Workflow didn't come around yet. But that didn't matter because in August 22nd, 2003, they had already connected it to this GDS beta box that allowed it to be accessed by government employees in other locations. And so that was essentially a private website. If you knew what the IP address was, you were able to enter in. And then from there, you were able to access it and retrieve data, which is what Matthew Mills and Glenn Ellman had said in their declaration. It should be clear, employees and contractors, right? Not at that time. Well, Northrop Grumman was a contractor, so they were. But aside from that, it was government employees at that time. The other contractors came on board for further prototype testing, or not prototype testing, but further implementation and production testing is what I'm looking for, later on in the May of 2004 timeframe. And then in August 2004, that's when they went absolutely live. But that's the difference between a 1498 takings case, which is not in the district court, as Unichat keeps saying. It's in the Court of Federal Claims. And we look at the first accrual. The first accrual meaning when was this made available by and for use by the government? And the initial testing by Northrop Grumman and then by the government itself constitutes testing that begins the accrual. And so the August 2004 date that Unichat keeps asserting about when it went live, when it was up and running, there's no up and running mentioned anywhere in 2501. 28 U.S.C. 2501 says that a claim is barred unless it's filed within six years of the date of first accrual. First accrual here is when whatever they're accusing of infringement was in existence and was made available for the government. So the question that Judge Dyke asked, which is the operative question is, okay, well, were they somehow able to undo the accrual by showing that something else happened later that that would have been the infringement but the earlier version wouldn't have been? And the only thing that they can point to is this WAWF, which is not a network that they didn't have before. It's just this new invoicing procedure and this new invoicing mechanism that they didn't have before. That's not part of IUID. That's just another mechanism by which data can be transmitted to the IUID memory system. So that's not what the issue is. But we're not the only ones to make that argument. Unitrack made that same argument. And when you look at A2676, this is the pre-litigation correspondence that Unitrack was submitting to the government in the hopes of trying to get money. And they said the WAWF training site was part of the DOD infringement practice. But then they said, because not all parties responsible for submitting data to the IUID registry are WAWF enabled, a number of alternative direct submission methods are available. There are four methods that can be used to submit IUID data directly. Three electronically and one manually. And then on the next page, A2677, it says manually data may be entered via the IUID web entry site. That's what was the functionality of the GDS beta box that was available earlier in August 2003. So this case really is like if a tank were delivered and an army tank were delivered in 2003 and then in August of 2004 they decided to put mirrors on the tank. So what? Unless the patent claim was directed to a tank with mirrors, that wouldn't matter. That's where we are here. What is the difference between the two? Just because it had additional functionality, the question is whether that functionality is relevant. The other issue about 1H is that it was never addressed by the Court of Federal Claims directly because they never raised it. They raised 1B, which is just a means for transmitting. And for the first time on appeal, they're raising a whole different claim limitation, 1H, which is also covered by the GDS beta box and is also covered by the same language in Matthew Mill's declaration for which he was also cross-examined. But nonetheless, it's important to note that this argument was waived anyway. For some reason, they didn't want to provide any argument about why there was any real difference between the more recent version versus the original version. Let's get to the tolling issue for a minute. Section 286 doesn't use the word administrative claim, but it does use the word claim, and it uses it twice. It says that we need to have a written claim, and then the tolling exists until there's a final denial of that claim. And the mechanism by which the DoD operates is that they were unable to deny a claim until a claim was filed. That's how the DFARS works. So the DFARS is not an interpretation of 286. It's their mechanism by which they implement 286. That's the fundamental difference. So the Infotech case that they're citing about whether 286 is somehow ambiguous, that's not the issue. The issue is that this is the mechanism by which the DoD can handle a claim. Now, two issues. Number one, what would happen if we created this loosey-goosey system where we just look at what's written and try to find, well, it seems like it's sufficiently detailed, then we'll start the tolling? The problem with that is that then the government would never actually deny the claim because no claim was filed. And that would allow the patentee to always game the system to get the full six years because they would provide some information and then there would never be any denial. And here, by the way, the government never treated it as a claim. Not only did they say we're not going to treat it as a claim, but they also didn't treat it as something where they actually were going to pay money. When you see the claim charts and so forth that Unitrack raises, those were claim charts that Unitrack was submitting. Those weren't claim charts that the government was analyzing. The government just said, if you want to have a meeting, we'll have a meeting. Thank you. That was very interesting. When are you going to submit a claim? Under the DFARS procedure. Why is it that Unitrack didn't submit a claim under the DFARS procedure? Well, if you look at the patents, these aren't regular patents. These are reissue patents. These are reissue patents where about two weeks after they first started corresponding with the government, they put the patent in reissue. A petition for reissue is an offer to surrender your patent. That's why they didn't submit a claim under DFARS. They weren't even sure whether they were going to have a patent at that point. And when did they actually capitulate and say, yes, we'll allow this to be handled as a DFARS claim? Coincidentally, two weeks after the reissue date on the patent. That's why we had this really unorthodox procedure where they refused to submit something. They knew that the government would look at this and say, well, this isn't even really a patent yet. We don't know where this stands. Okay, thank you, Mr. Ullman. We're out of time. Thank you. Mr. Hayes, you have two minutes. First of all, Your Honor, the argument of 1H and that argument was indeed brought to the attention of the court was indeed challenged. It's A2600. There's no question about that. That argument was made. Secondly, if you look at 1H, it's talking about electronic means of communication between the user, which is, I think, one of the members here pointed out, were contractors, et cetera. It was not, as my brother just conceded, a manual operation. We've cited to you effectively this beta block where you manually type it in, et cetera. The beta block device is not with all the contractors around the world, that have it. So, I mean, it's not the WAWF system. My brother's saying the system didn't exist. The WAWF network was in existence long before all of this. The whole purpose of this entire project was to develop a registry that would be integrated into the WAWF, and we have that specifically cited to you on the WAWF booklet of May of 2000, which is 2004, which is the date the government conceded effectively as the first date. That was the date we asked. And now they're just trying to take it all back, and I think it is absolutely clear under the law that, in fact, this manual, this box that they're talking about is not going to substitute and wouldn't even be an infringement if, in fact, you were going to argue this at a court of infringement. They would say, well, that's not it because manually typing this stuff, et cetera, in one location is not going to do it, period. I think that's quite a stretch. What about the use of the GDX box? Excuse me? What about the use of the GDX box? My understanding that you have to have, that is not going, you have to read, if you just read paragraph H of Claim 1 of the patent, it doesn't just talk about communication. It says, means for providing this uniform system to a plurality of users, and means for instantly receiving updated data relating to the article. That means the user is going to get that updated data. The user has to have that means. The user has to have that means at his disposal, the contractor that we're talking about here. That box is not in the contractor's office, and neither one of them are. Okay, Mr. Hayes, I think we're out of time. Thank you very much. Okay, thank you, Judge. We thank all counsel who faithfully submitted.